IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIN M. WHITTLE | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MICHAEL J. ASTRUE, | : | |
| Commissioner of Social Security | : | No: 10-7469 |

**REPORT AND RECOMMENDATION**

ELIZABETH T. HEY, M.J.                              March 26, 2012

This action was brought pursuant to 42 U.S.C. § 405(g) to review the final

decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's

application for disability insurance benefits ("DIB") under Title II of the Social Security

Act.  For the reasons that follow, I find that the Commissioner's final decision does not

contain substantial evidence to support the findings of fact and conclusions of law of the

Administrative Law Judge ("ALJ").  Therefore, I recommend that the case be remanded

to the Commissioner for further proceedings pursuant to sentence four of 42 U.S.C.

§ 405(g).

## I.     **PROCEDURAL HISTORY**

Plaintiff protectively filed for DIB on July 3, 2008, alleging disability as of June

27, 2008, due to bipolar disorder, seasonal disorder, depression, and a personality

disorder.  Tr. at 91-92; 104, 108.[1]  The application was denied initially on November 7, 2008, and Plaintiff requested an administrative hearing.  Id. at 44-47, 52-53.

On January 6, 2010, an ALJ held an administrative hearing at which Plaintiff and a Vocational Expert ("VE") testified.  Tr. at 20-41.  In a decision dated February 16, 2010, the ALJ denied Plaintiff's claims, finding that Plaintiff was not disabled within the Act's meaning.  The ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform work at all exertional levels with certain non-exertional limitations, and the VE identified a significant number of jobs meeting the criteria set by the ALJ.  Id. at 19.  On November 1, 2010, the Appeals Council denied Plaintiff's request for review. Tr. at 1-3.  Therefore, the decision of the ALJ is the final decision of the Commissioner. 20 C.F.R. § 404.981.

Plaintiff commenced this action on December 23, 2010, and submitted her brief and statement of issues on May 17, 2011.  See Doc. 10.  Defendant filed a response to the request for review on June 16, 2011, see Doc. 12, and Plaintiff filed a reply on June 27, 2011.  See Doc. 13.

## II.   LEGAL STANDARD

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. §§ 405(g); Richardson v.

---

[1]Plaintiff filed an earlier application for benefits in 2007, which was denied at the initial level and Plaintiff did not appeal.  Tr. at 105.

Perales, 402 U.S. 389 (1971); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).

Therefore, the issue in this case is whether there is substantial evidence to support the

Commissioner's conclusion that Plaintiff is not disabled.  Substantial evidence is "such

relevant evidence as a reasonable mind might accept as adequate," and must be "more

than a mere scintilla."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 118 (3d Cir. 2000)

(quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999)).  The court has plenary

review of legal issues.  Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir.

1999) (citing 42 U.S.C. § 405(g)).

To prove a disability, a claimant must demonstrate "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last . . . not less than twelve

months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process,

evaluating:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. If not, whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities;

3. If so, whether, based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;

4.     If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the RFC to perform his past work; and

5.     If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Allen v. Barnhart, 417 F.3d 396, 401 n.2 (3d Cir. 2005) (quoting Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000)) (internal citations omitted); see also 20 C.F.R. § 404.1520(a)(4).  Plaintiff bears the burden of proof at steps one through four of this test, while the Commissioner bears the burden of proof at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of her age, education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

## III.    FACT RECORD AND THE ALJ'S DECISION

Plaintiff was born on January 17, 1976.  Tr. 91, 104.  She was 32 years old at the time of the alleged onset of her disability, and 33 years old at the time of the administrative hearing  Id. at 23-24.  She is 5 feet 5 inches tall and weighs 210 pounds. Id. at 107.  Plaintiff lives with her husband and two children, who were 5 and 7 years old at the time of the administrative hearing.  Id. at 24.  Plaintiff completed high school.  Id. at 112.[2]  Plaintiff's past relevant work includes working for the IRS as a tax examiner,

_____

[2]At one of her evaluations, Plaintiff reported that she was enrolled in community college for two years, but never attended classes.  Tr. at 256.

administrative assistant, and data entry clerk, prior to which she worked as a truck driver and a waitress.  Id. at 38, 109, 122.  Plaintiff explained that she worked full-time for the IRS, but when "things started getting bad" with her anxiety level, she was permitted to switch to part-time (4 hours a day) work.  Id. at 28-29.  She resigned her position on the advice of her doctor in the last week of June 2008.  Id.

Plaintiff's primary care physician was Neil M. Cohen, M.D., whom she indicated she began seeing in January of 2001.  Tr. at 110.  The records provided by Dr. Cohen consist primarily of five pages of office notes that span from April 2007 to August 2008.  Id. at 243-47.  Dr. Cohen's notes state that Plaintiff suffered from bipolar disorder,[3] manic

---

[3]Bipolar disorder, or manic-depressive illness, is more accurately a group of disorders generally characterized by mild, moderate or severe episodes of manic, mixed or major depressive moods.  Diagnostic and Statistical Manual of Mental Disorders, 4th ed. Text Revision (2000), ("DSM IV-TR"), at 382-83.  The essential feature of Bipolar I Disorder is a clinical course characterized by one or more manic or mixed episodes, often with one or more major depressive episodes.  Id. at 382.  The essential feature of Bipolar II Disorder is a clinical course characterized by one or more major depressive episodes with at least one hypomanic episode.  Id. at 392.

depression and seasonal disorder.  Id. at 245.  It appears that he prescribed Clonazepam,[4]

Lamictal,[5] and Geodon[6] during his treatment of Plaintiff.  Id. at 247.[7]

    The administrative record also contains treatment notes from the Growth

Opportunity Center, where Plaintiff began mental health treatment on October 19, 2005.

Tr. 381-489.  Plaintiff was originally diagnosed with recurrent major depressive disorder,

but her diagnosis was later changed to post traumatic stress disorder ("PTSD"), bipolar

disorder, and seasonal affective disorder.  Id. at 424, 462.  The notes of Lucia Katz, M.D.,

Plaintiff's treating psychiatrist at the Growth Opportunity Center, also contain diagnoses

of personality disorder, borderline personality disorder,[8] and a history of attention deficit

hyperactivity disorder ("ADHD").  Id. at 277, 406, 412.  Dr. Katz completed an

---

[4]Clonazepam is used to treat seizure disorders or panic disorders.  See http://www.drugs.com/clonazepam.html (last visited Feb. 22, 2012).

[5]Lamictal is used either alone or in combination with other medications to treat epileptic seizures in adults and children.  Lamictal is also used to delay mood episodes in adults with bipolar disorder (manic depression).  See http://www.drugs.com/lamictal.html (last visited Feb. 22, 2012).

[6]Geodon is an antipsychotic medication, used to treat schizophrenia and the manic symptoms of bipolar disorder (manic depression).  See http://www.drugs.com/geodon.html (last visited Feb. 22, 2012).

[7]Dr. Cohen's records also indicate that Plaintiff was taking Seraquel, Cymbalta (defined infra at nn. 10, 13) and Klonopin, a brand name of Clonazepam (defined supra at n. 4), but it is unclear whether he was the prescribing physician or merely listing the medications prescribed by another physician.  See tr. at 245.

[8]Borderline Personality Disorder is a pattern of instability in interpersonal relationships, self-image, and affects, and marked impulsivity.  DSM IV-TR at 685.

occupational assessment in November of 2008, noting that Plaintiff had a poor ability to deal with work stresses and only a fair ability to maintain concentration due to her medications.  Id. at 278.  In addition, Dr. Katz found that Plaintiff had a poor ability to behave in an emotionally stable manner and relate predictably in social situations.  Id. at 280.  She also found that Plaintiff was likely to decompensate in a work setting under stress.  Id. at 281.  During the relevant time, Dr. Katz prescribed Plaintiff lithium,[9] Seroquel,[10] Wellbutrin,[11] Vyvance,[12] and Cymbalta.[13]  Id. at 389, 391, 394, 401, 402, 409, 410.

Plaintiff also saw Trish Miron, Psy. D., a licensed professional counselor during her treatment at the Growth Opportunity Center, beginning in April 2008.  Tr. at 288.  In

---

[9]Lithium is used to treat the manic episodes of bipolar disorder.  Manic symptoms include hyperactivity, rushed speech, poor judgment, reduced need for sleep, aggression, and anger.  It also helps to prevent or lessen the intensity of manic episodes.  See http://www.drugs.com/lithium.html (last visited Feb. 23, 2012).

[10]Seroquel is an antipsychotic medicine used to treat schizophrenia and bipolar disorder, and is used with antidepressant medication to treat major depressive disorder in adults.  See http://www.drugs.com/seroquel.html (last visited Feb. 23, 2012).

[11]Wellbutrin is an antidepressant medication used to treat major depressive disorder and seasonal affective disorder.  See http://www.drugs.com/wellbutrin.html (last visited Mar. 7, 2012).

[12]Vyvanse is used to treat ADHD.  See http://www.drugs.com/vyvanse.html (last visited Feb. 23, 2012).

[13]Cymbalta is an antidepressant is used to treat major depressive disorder and general anxiety disorder.  See http://www.drugs.com/cymbalta.html (last visited Feb. 23, 2012).

an assessment prepared in December 2008, Dr. Myron noted that Plaintiff had a poor ability to relate to coworkers and deal with the public, deal with work stresses, use judgment, and concentrate.  Id. at 284.  Dr. Myron, like Dr. Katz, noted that Plaintiff was likely to decompensate at work due to stress.  Id. at 287.

On January 19, 2009, Plaintiff attempted suicide by overdosing on Vyvance and Clonazepam, after having an argument with her husband.  Tr. at 299.  She was admitted to Holy Redeemer Hospital, where Brad Paddock, M.D., noted that she was unable to give her history due to rambling and disconnected thoughts and speech.  Id. at 310.  The doctor found that Plaintiff was unable to answer even a direct question.  Id.  The following day, January 20, she left the hospital against medical advice.  Id. at 355.

That same day, Plaintiff's husband ascertained that Plaintiff could go to Horsham Clinic if she had medical clearance.  Tr. at 366.  Thus, Plaintiff's husband took her to Abington Memorial Hospital to obtain such clearance.  She was seen in the emergency room and explained that she had a breakdown two days earlier and overdosed on her medication, was admitted to Holy Redeemer, but "ripped [her] iv out this [morning]."  Id. at 361.  She was discharged later that day to Horsham Clinic with diagnoses of bipolar disorder, borderline personality disorder, and a urinary tract infection.  Id. at 369.

Upon her admission to the Horsham Clinic, Plaintiff was found to have a Global Assessment of Functioning ("GAF") score of 25.[14]  Plaintiff was discharged against medical advice four days later with diagnoses of bipolar disorder, most recent episode manic, status post overdose, ADHD by history, marijuana abuse and a history of cocaine abuse, borderline personality disorder by history, and obesity.  Id. at 373-75.  Her GAF score on discharge was 45-50.[15]

Upon her discharge from the Horsham Clinic, Plaintiff continued treatment at the Growth Opportunity Center with Drs. Katz and Myron, and also began treatment with Princeton House on February 2, 2009.  Tr. at 377, 406-08.  She attended the outpatient program for two weeks, but was discharged because she became ill and was not attending. Id. at 378.  At discharge on February 13, 2009, her diagnosis was bipolar disorder mixed, with a GAF of 40-42.  Id.  She continued treatment at the Growth Opportunity Center after discharge from Princeton House.[16]  Id. at 381-405.

---

[14] The GAF score is a measurement of a person's overall psychological, social, and occupational functioning, and is used to assess mental health.  DSM IV-TR at 32.  A GAF of 21-30 indicates that "[b]ehavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."  Id. at 34.

[15] A GAF of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning."  DSM IV-TR at 34.

[16] In a letter dated January 10, 2010, Susan Ryan, Psy.D., stated that "[t]he last time [Plaintiff] came in for a session was March 12, 2008."  Tr. at 462.  However, the

The administrative record also contains reports from two non-treating sources. Psychologist Mark S. Wagner, Ph.D., examined Plaintiff at the request of the Administration on October 31, 2008.  Tr. at 255-60.  He concluded that Plaintiff suffered from bipolar disorder, most recent episode depressed, with a guarded prognosis.  Id. at 258.  He noted that although she was responsible for most of the cooking, shopping, cleaning, and paying the bills, she had a great deal of difficulty concentrating.  Id.  Dr. Wagner opined that Plaintiff had marked limitations in her ability to understand and carry out detailed instructions, marked limitations in her ability to interact with supervisors and coworkers, extreme limitation in her ability to respond appropriately to work pressures, and moderate difficulties in her ability to understand and carry out simple instructions, make judgments on simple work related decisions, interact with the public and respond to changes in a routine work setting.  Id. at 259.

Finally, Joseph J. Kowalski, a disability examiner, completed a Psychiatric Review Technique Form ("PRTF") on November 6, 2008, after reviewing Plaintiff's records.  Tr. at 261-75.  Mr. Kowalski concluded that Plaintiff suffered from bipolar disorder, not otherwise specified.  Id. at 264.  He found that Plaintiff had mild restrictions in her activities of daily living, and moderate restrictions in social functioning and maintaining concentration.  Id. at 271.  Specifically, Mr. Kowalski found Plaintiff had no limitation in

---

treatment notes from Drs. Katz and Myron establish that Plaintiff continued treatment with the Growth Opportunity Center through January 2010.

remembering work procedures or understanding/remembering simple instructions.  He found no significant limitation in Plaintiff's ability to understand detailed instructions, carry out simple instructions, sustain a routine, work in coordination with others without being distracted, make work-related decisions, ask for instruction and accept instruction and criticism from supervisors, get along with coworkers, maintain socially appropriate behavior, and set realistic goals and plans independently.  Id. at 274-75.  Mr. Kowalski found moderate limitations in Plaintiff's ability to carry out detailed instructions, maintain concentration, perform activities within a schedule and maintain regular attendance, interact with the public, and respond to changes in the work setting.  Id.  Mr. Kowalski found that Plaintiff suffered from no marked limitations.  Id.

After reviewing the record, the ALJ determined that Plaintiff suffered from bipolar disorder, borderline personality disorder, and substance abuse.  Tr. at 14.  In questioning the VE, the ALJ asked her to consider someone of Plaintiff's age, education, and work history, who could perform work at all exertional levels, but could perform only self-paced work involving routine one to two step tasks, with few work changes and limited contact with the public and coworkers.  Id. at 38.  The VE identified three job categories with significant numbers of jobs in the local and national economies.  Id. at 39.  Based on the testimony of the VE, the ALJ concluded that Plaintiff was not disabled.  Id. at 19.

The ALJ followed the five-step sequential analysis, and found as follows at each step:

1.     At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 27, 2008, the alleged onset date of her disability.  Id. at 14.

2.     At step two, the ALJ determined that Plaintiff had the following severe impairments: bipolar disorder, borderline personality disorder, and substance abuse.  Id.

3.     At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, Regulations No. 4.  Id.

4.     The ALJ found that Plaintiff had the RFC to perform a full range of work at all exertional levels with the following nonexertional limitations: the claimant was limited to routine, one-two step tasks, with no detailed instructions, in work that is as self-paced as possible with few work changes, and involves only limited contact with the public and co-workers.  Id. at 15.  Thus, she determined at step four that Plaintiff could not return to any of her past relevant work.  Id. at 18.

5.     At step five, based on the testimony of the VE, the ALJ found that Plaintiff could perform security work, work as a machine tender, or as a merchandise stocker.  Id. at 19.  Thus, the ALJ found that Plaintiff was not disabled.  Id.

In her Request for Review, Plaintiff argues that the decision of the ALJ is not supported by substantial evidence because the ALJ (1) failed to accord proper weight to the opinions of Plaintiff's treating physicians, which would result in an award of benefits, (2) failed to the develop the record with regard to the finding that Plaintiff's mental impairments had improved, (3) erred in her summary dismissal of the "Paragraph C" criteria in considering whether Plaintiff's mental impairments met the listings, (4) failed to consider the diagnoses of PTSD and ADHD in her opinion, and (5) failed to consider

Plaintiff's obesity. In response, Defendant argues the decision of the ALJ is supported by substantial evidence.

## IV.   **DISCUSSION**

### A.   **Consideration of Mental Health Providers' Opinions**

There are times in reviewing social security appeals that I wonder whether the treating physicians, consultants, and reviewers are evaluating the same person and records based on the sharp contrast in opinion. This is one of those times.

As previously mentioned, both Plaintiff's treating psychiatrist, Dr. Katz, and treating psychologist, Dr. Miron, opined that Plaintiff had a poor ability to behave in an emotionally stable manner and relate predictably in social situations. Tr. at 280, 286. Both opined that Plaintiff was likely to decompensate in a work-like setting and would miss three or more days per month due to her psychological symptoms. Id. at 281, 287. Consistent with the reports of Drs. Katz and Miron, Dr. Wagner, a consultative psychologist who also examined Plaintiff, found that Plaintiff suffered from extreme limitations in responding to work pressures in a work setting, and marked limitations in interacting with coworkers and supervisors, and understanding and carrying out detailed instruction. Id. at 259. Within three months of these assessments (dated in October, November, and December 2008), Plaintiff attempted suicide by overdose (January 19, 2009). Id. at 299, 369. On her admission to the Horsham Clinic after her discharge from the hospital, she had a GAF of 25, see tr. at 373, indicating serious impairment in

communication or judgment, or an inability to function in almost all areas.  DSM-IV, at 34.  Upon her discharge from Horsham Clinic four days later she was found to have a GAF of 45-50, indicating serious symptoms/impairments in social, occupational or school functioning.  Id.

The ALJ, reviewing the record in February 2010, gave little weight to the findings of Drs. Katz, Miron, and Wagner because their reports were completed in 2008 and Plaintiff had shown improvement since that time, and because they relied on Plaintiff's own statements regarding her symptomatology.  Tr. at 17.  Instead, the ALJ partially relied on the PRTF completed in November 2008 by Mr. Kowalski, a non-examining, state agency psychological consultant, in which Mr. Kowalski opined that Plaintiff's bipolar disorder resulted in moderate limitations in Plaintiff's ability to carry out detailed instructions, maintain attention, and maintain attendance, and respond to changes in the work setting.  Id. at 274-75.  Mr. Kowalski found no marked limitations.[17]

Plaintiff complains that the ALJ failed to accord proper weight to the opinions of Plaintiff's treating physicians, as supported by Dr. Wagner.  See Doc. 10 at 9-16. Defendant argues that the ALJ was not bound by the opinions of Drs. Katz, Miron, and Wagner, and properly evaluated this opinion evidence.  See Doc. 12 at 17-25.  A treating

---

[17]There is an inconsistency in the ALJ's reasoning that is immediately apparent, namely that Mr. Kowalski's November 2008 assessment was considered reliable whereas the reason given for rejecting the other assessments was that they were completed in or about November 2008.

physician's opinion is entitled to controlling weight when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(d)(2).  When a treating physician's opinion is not accorded controlling weight, in determining the weight to be given to a medical opinion, the ALJ should consider the examining relationship (more weight accorded an examining source), treatment relationship (including the length and nature of the treatment relationship), supportability, consistency, specialization, and other factors.  Id. at § 1927(d)(1)-(6).

Here, the Commissioner argues that the "automatic adoption of the opinion of a treating physician is not required."  Doc. 12 at 17.  After reviewing the Plaintiff's brief, instead of arguing that her treating physicians' opinions were entitled to controlling weight under section 1927(d)(2), I believe Plaintiff is arguing that the ALJ failed to properly consider the treating physicians' opinion in light of all the factors set forth in subsection 1927(d).  See Doc. 10 at 7-9.  After reviewing the medical record, I agree.

Specifically, the ALJ gave limited weight to the treating physicians' opinions and that of Dr. Wagner partially based on the opinion of Mr. Kowalski, a non-treating, non-examining, non-physician.  See tr. at 18.  My main concern with Mr. Kowalski's assessment is that it was not fully-informed.  Mr. Kowalski completed his assessment on November 6, 2008, a week after Dr. Wagner's assessment, but prior to the assessments

15

provided by Plaintiff's treating psychiatrist and psychologist.[18]  Additionally, it does not

appear from Mr. Kowalski's report that he reviewed any of the Growth Center records,

other than the intake information.  See id. at 273 (noting review of intake records from

12/2/06).

        The ALJ gave Mr. Kowalski's opinion "significant weight" because "it is more

consistent with the claimant's overall level of functioning."  Tr. at 18.  However, the ALJ

failed to put the medical opinions in the proper chronological perspective.  As previously

mentioned, within three months of all the psychological opinions offered by Drs. Katz,

Miron, Wagner, and Mr. Kowalski, Plaintiff attempted suicide by overdose.  On her

admission to the Horsham Clinic after her discharge from the hospital, she had a GAF of

25, see id. at 373, indicating serious impairment in communication or judgment, or an

inability to function in almost all areas.  DSM-IV at 34.  Upon her discharge from

Horsham Clinic four days later she was found to have a GAF of 45-50, indicating serious

symptoms/impairments in social, occupational or school functioning.  Id.  Further, as will

be discussed, the records demonstrate that Plaintiff continued treatment for months

following her discharge, the most recent of which showed her doctors continued to

observe active symptoms of her bipolar and borderline personality disorders while on

---

        [18]As noted, the ALJ gave limited weight to the assessments of Drs. Katz, Miron,
and Wagner in part because they were completed in 2008.  See tr. at 17.  However, Dr.
Wagner prepared his assessment just a week before Mr. Kowalski, and the reports of Drs.
Katz and Miron post-dated that of Mr. Kowalski.

medication.  Id. at 381 (Dec. 17, 2009), 464 (Dec. 15, 2009).  Thus, when put in chronological perspective, I do not find that the ALJ's conclusion that Mr. Kowalski's assessment is consistent with Plaintiff's overall level of functioning is supported by substantial evidence.

The ALJ also stated that she gave little weight to the treating physicians' reports because she found the opinions stated in the reports "rely at least partially on the claimant's subjective complaints," and the ALJ considered Plaintiff's complaints of severely decreased functioning not entirely credible.  Tr. at 17.  I note that in the section of her report regarding "making performance adjustments," Dr. Miron stated that "[o]bservations are based on [Plaintiff's] self-report."  Id. at 285.  The ALJ failed, however, to consider the evidence which supported the treating physicians' opinions, including Dr. Wagner's opinions, and the reports, including GAF scores, from Horsham Clinic and Princeton House after her suicide attempt.[19]

---

[19]Although the ALJ acknowledged Plaintiff's suicide attempt and subsequent hospitalization and more intensive psychological treatment, he failed to mention or discuss her GAF scores during that treatment.  "Failure to discuss a GAF score that supports serious impairments in social or occupational functioning requires remand." Nieves v. Astrue, No. 08-5178, 2010 WL 629831, at *5 (E.D. Pa. Feb. 19, 2010) (Joyner, C.J. adopting Rice, M.J.) (citing Holmes v. Barnhart, No. 04-5765, 2007 WL 951637, at *11 (E.D. Pa. Mar. 26, 2007) (Pratter, J.) (remand required because ALJ failed to acknowledge claimant's GAF score of 50); Escardille v. Barnhart, No. 02-2930, 2003 WL 21499999, at *6-7 (E.D. Pa. June 24, 2003) (Giles, J.) (remand required because ALJ opinion did not evidence he seriously considered claimant's GAF score of 50); see also Schnettler v. Astrue, No. 08-5811, 2010 391424, at *8-9 (E.D. Pa. Jan. 25, 2010) (Savage, J. adopting Hey, M.J.) (failure to discuss GAF scores is error).

Finally, the ALJ found that the assessments of Drs. Katz, Miron, and Wagner were inconsistent with Plaintiff's apparent improvement. "Each of these three opinions is given limited weight. They were all completed in 2008, and as discussed above the claimant appears to have improved since then and has been engaging in more activities of daily living." Tr. at 17. I agree that some of the notes of Plaintiff's more recent treatment sessions with Dr. Miron do seem to evidence a decrease in mental symptomatology and increases in Plaintiff's coping skills and activities. See id. at 465 (12/21/09 - "appears emotionally strong"); 466 (11/10/09 - helping with mother-in-law, making her dinner and doing her hair); 469 (9/1/09 - applied to be home room mom for son's class); 470 (8/4/09 - doing well and paying attention to her anger); 471 (7/14/09 - feels calmer, 7/28/09 - went camping and making contact with old friends). However, others evidence great stress and an inability to cope properly with stress and pressure. See id. at 466 (11/24/09 - "freaked out" about car accident); 465 (12/8/09 - "feeling frustrated"). Significantly, on December 15, 2009, Dr. Miron completed a Re-evaluation of Suicide Risk form, noting that Plaintiff had suicidal thoughts because she was feeling overwhelmed. Id. a 464. Dr. Miron noted, among other risk factors, Plaintiff's feelings of hopelessness, perceived burdensomeness, agitation/anxiety, emotional upset, impulsive/aggressive behavior, and difficulty concentrating. Id. Dr. Katz also noted that Plaintiff was feeling overwhelmed and experiencing poor emotional control during the latter half of 2009, and continued to adjust her medications accordingly. Id. at 381-83, 385-91.

18

Thus, although some of the more recent treatment records reflect an improvement in Plaintiff's psychological well-being, there is contrary medical evidence in Dr. Miron's and Dr. Katz's treatment notes during the same time period.  An ALJ may not substitute his own opinion for that of a medical provider and may not rely on only those pieces of the record that support his determination.  See Morales v. Apfel, 225 F.3d 310, 318 (3d Cir. 2000) (ALJ cannot "disregard . . .  medical opinion based solely on his amorphous impressions, gleaned from the record and from his evaluation of [the claimant's] credibility") (citing Kent v. Schweiker, 710 F.2d 110, 115 (3d Cir. 1983)).  Considering the evidence as a whole, the ALJ's interpretation of some of the more recent psychological treatment notes does not provide substantial evidence to support her rejection of the opinions expressed by Plaintiff's treatment providers and that of Dr. Wagner.

Plaintiff contends that proper consideration of the medical record results in an award of benefits.  Doc. 10 at 8-9.  However, an award of benefits is appropriate only where the administrative record has been fully developed and substantial evidence supports a finding of disability.  Podedworny v. Harris, 745 F.2d 210, 222 (3d Cir. 1984).  Here, the psychological evaluations in the record predate Plaintiff's suicide attempt or occurred shortly after her release from the hospital.  See tr. 255-260 (Wagner Report dated 10/31/08), 261-75 (Kowalski Report dated 11/6/08), 277-82 (Katz Report dated 11/18/08), 283-88 (Miron Report dated 12/23/08), 373-75 (Horsham Clinic Report 1/20-

24/09), 377-78 (Princeton House Report 2/13/09).  Considering the timing of these

assessments and in light of Dr. Miron's and Dr. Katz's more recent treatment notes,

which contain evidence of improving and degrading psychological symptoms, an updated

psychological evaluation would seem appropriate.[20]

**B.    Remainder of Plaintiff's Claims**

In addition to challenging the ALJ's consideration of the medical evidence,

Plaintiff also complains that the ALJ failed to properly consider the Paragraph C Criteria

of Listing 12.04C, failed to consider Plaintiff's PTSD and ADHD, and failed to consider

Plaintiff's obesity.  See Doc. 10 at 17-21.  Because I have recommended remanding the

case for further consideration of the medical opinion, I do not find it necessary to address

these additional alleged deficiencies in the ALJ's decision in significant detail.

**1.    Listing 12.04C**

Listing 12.04, which applies to affective disorders, including bipolar disorder,

requires the claimant to establish that he or she suffers from certain limitations listed

---

[20]Plaintiff also argues that the ALJ failed to develop the record with regard to the finding that Plaintiff's mental impairments had improved.  See Doc. 10 at 16-17.  As explained, Dr. Miron's and Dr. Katz's more recent treatment notes contain evidence both of improvement and degradation of Plaintiff's psychological symptoms.  See supra at 18-19.  I agree that the ALJ's interpretation of Dr. Miron's recent treatment notes does not provide substantial evidence to support her rejection of the other medical evidence in the record.  Because I have found that additional psychological assessment is necessary to determine the more recent state of Plaintiff's mental impairment, further development of the record is necessary, including reconsideration of Dr. Miron's more recent treatment notes.

either in subsections A <u>and</u> B <u>or</u> in subsection C.[21]  In her decision, the ALJ merely stated

_____

[21] 12.04 *Affective Disorders:* characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements of C are satisfied.

A.  Medically documented persistence, either continuous or intermittent, of one of the following:

    1.  Depressive syndrome characterized by at least four of the following:

        a. Anhedonia or pervasive loss of interest in almost all activities; or

        b. Appetite disturbance with change in weight; or

        c. Sleep disturbance; or

        d. Psychomotor agitation or retardation; or

        e. Decreased energy; or

        f. Feelings of guilt or worthlessness; or

        g. Difficulty concentrating or thinking: or

        h. Thoughts of suicide; or

        i. Hallucinations, delusions, or paranoid thinking; or

    2.  Manic syndrome characterized by at least three of the following:

        a. Hyperactivity; or

        b. Pressure of speech; or

        c. Flight of ideas; or

        d. Inflated self-esteem; or

        e. Decreased need for sleep; or

        f. Easy distractability; or

        g. Involvement in activities that have high probability of painful consequences which are not recognized; or

        h. Hallucinations, delusions or paranoid thinking; or

    3.  Bipolar syndrome with a history of episodic periods manifested by the full symptomatic pictures of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B.  Resulting in at least two of the following:

1.  Marked restriction of activities of daily living; or

2.  Marked difficulties in maintaining social functioning; or

3.  Marked difficulties in maintaining concentration, persistence, or pace; or

4.  Repeated episodes of decompensation, each of extended duration;

that "the evidence fails to establish the presence of the 'paragraph C' criteria." <u>Tr.</u> at 15.

Plaintiff complains that this is inadequate.  Because I have recommended that the case be

remanded for further consideration of the medical record and further mental health

assessment, on remand, the ALJ should reconsider whether Plaintiff's mental health

impairment meets the criteria for Listing 12.04 in light of the reconsideration of the

evidence currently in the record and any additional assessments regarding  Plaintiff's

more recent condition and symptomatology.  This will require the ALJ to revisit the both

the A/B and C criteria of Listing 12.04, at which time I suggest the ALJ more specifically

address subsection 2 of the C criteria.

---

OR
C.     Medically documented history of a chronic affective disorder of at
       least 2 years' duration that has caused more than a minimal
       limitation of ability to do basic work activities, with symptoms or
       signs currently attenuated by medication or psychosocial support,
       and one of the following:
1.     Repeated episodes of decompensation, each of extended duration; or
2.     A residual disease process that has resulted in such marginal
       adjustment that even a minimal increase in mental demands or
       change in the environment would be predicted to cause the
       individual to decompensate; or
3.     current history of 1 or more years' inability to function outside a
       highly supportive living arrangement, with an indication of
       continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

2.    <u>PTSD and ADHD</u>

Plaintiff also contends that because the ALJ failed to mention Plaintiff's diagnoses of PTSD and ADHD, it is unclear whether the ALJ considered the effects of these disorders in her assessments of Plaintiff's abilities.  <u>See</u> Doc. 10 at 27-28.[22]  Defendant counters that the ALJ considered all of Plaintiff's impairments, including those that were not found to be severe, in addressing Plaintiff's RFC.  <u>See</u> Doc. 12 at 27.

Again, I note that Plaintiff's treatment notes are inconsistent.  The earlier treatment notes from the Growth Opportunity Center indicate diagnoses of PTSD or ADHD or both, <u>see</u> <u>tr.</u> at 238, 277, 283, 409, 411, 412, 413, 414, 419, 420, 425, 427, 428, 429, 430, 431, 433, 434, while the more recent notes refer only to borderline personality or personality disorder and bipolar disorder.  <u>See</u> <u>id.</u> at 381-382, 383, 385, 391, 394, 398, 401, 404, 406. It does not appear that the ALJ teased out limitations attributable to only bipolar disorder and borderline personality or personality disorder in assessing Plaintiff's abilities.

---

[22]Plaintiff also complains that the ALJ incorrectly identified her personality disorder as borderline personality disorder.  <u>See</u> Doc. 10 at 19.  Personality disorder is the appropriate diagnosis in two situations; when the personality pattern meets the general criteria for a personality disorder and traits of several different personality disorders are present but the criteria for any specific personality disorder are not met, or when the personality pattern meets the general criteria for a personality disorder but the individual is considered to have a personality disorder that is not included in the classification system.  <u>DSM-IV-TR</u> at 685.  Borderline personality disorder as previously defined, <u>see</u> <u>supra</u> at 6 n.8, is a specific disorder under the category of personality disorders.  Review of Dr. Katz's treatment notes reveals that she repeatedly diagnosed Plaintiff with borderline personality.  <u>See</u> <u>tr.</u> at 381, 82, 385, 391, 398, 401, 404, 405, 406.  Rather than an error on the part of the ALJ, it appears that Dr. Katz referred to Plaintiff's personality disorder as "personality disorder" in some notes and "borderline personality" in others.

Presumably, Plaintiff's treating mental health providers included all of the limitations imposed by all of her mental impairments without regard to specific diagnosis in their prior assessments and would do so in completing any future assessment.  Nevertheless, I have found that the ALJ did not properly consider the opinions of Plaintiff's treating mental health providers and have recommended that the case be remanded.  Thus, the ALJ will have to reconsider Plaintiff's RFC in light of the entire record.  This will include the impairments/limitations caused by any of her mental health conditions, whether severe or not.  See Salles v. Comm'r of Soc. Sec., 229 Fed. Appx. 140, 147 (3d Cir. 2007) (requiring consideration of all medically determinable impairments regardless of severity in RFC assessment); 20 C.F.R. § 404.1523 ("we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity").

3.    Obesity

Finally, Plaintiff complains that the ALJ failed to consider the effects of Plaintiff's obesity at any stage of the sequential evaluation.  See Doc. 10 at 20-21.  Defendant argues that Plaintiff has never asserted that her obesity limited her ability to work in her application or in the appeal to the ALJ.  See Doc. 12 at 28-29.

In Rutherford v. Barnhart, 399 F.3d 546 (3d Cir 2005), the Third Circuit held that remand of the case for consideration of obesity was not necessary where the Plaintiff "never mentioned obesity as a condition that contributed to her inability to work," and

such consideration would not affect the outcome of the case.  399 F.3d at 553.  Here, as in

Rutherford, Plaintiff did not include obesity as one of the factors limiting her ability to

work in her application and failed to mention how her obesity limited her ability to work

at the administrative hearing.  Tr. at 108.

Nevertheless, the Commissioner has recognized that "[o]besity may . . . cause or

contribute to mental impairments such as depression."  S.S.R. 02-1p.  Here, Plaintiff's

depression led to a suicide attempt, at which time Plaintiff complained of feelings of

hopelessness and worthlessness.  Tr. at 373.  Although no mental health provider

specifically linked Plaintiff's obesity and her depression, considering that Plaintiff's

treatment providers noted her obesity in their records, it is likely that they also considered

Plaintiff's obesity and its effects on her depression and other mental impairments in

completing their assessments.  Because I have recommended that the case be remanded

for further consideration and development of the mental health records, and in light of the

Commissioner's Ruling, review of the records on remand should include consideration of

Plaintiff's obesity and its effect on her depression and other mental health impairments in

determining whether Plaintiff's impairments meet or equal the Listings and in

formulating her RFC.[23]

---

[23]There is no evidence that Plaintiff suffers from any physical impairment and
Plaintiff has failed to allege that her obesity poses any limitation on her ability to perform
exertional activities.  Thus, there is no need to address more than the effect Plaintiff's
obesity has on her mental impairments.

**V.**     **CONCLUSION**

The ALJ failed to properly consider the opinions and evidence submitted by Plaintiff's treating psychiatrist and psychological counselor, which were supported by a consultative psychologist's report.  Under the circumstances, the ALJ's reliance on a non-examining disability consultant and the ALJ's own interpretation of Plaintiff's more recent mental health treatment notes was inappropriate.  On remand, the Commissioner should reconsider the opinions in the record and obtain an updated psychological evaluation in light of the most recent treatment notes in the record.  In addition, the Commissioner should reconsider whether the combination of all of Plaintiff's impairments meets or equals the Listings, specifically the requirements of Listing 12.04, and, if necessary, reconsider Plaintiff's RFC in light of all of her impairments.

Therefore, I make the following:

### R E C O M M E N D A T I O N

AND NOW, this   26th        day of March, 2012, it is RESPECTFULLY

RECOMMENDED that the case be remanded to the Commissioner pursuant to sentence

four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report, Judgment

be entered REVERSING the decision of the Commissioner of Social Security for the

purposes of this remand only, and the relief sought by Plaintiff be GRANTED to the

extent that the matter be REMANDED for further proceedings consistent with this

adjudication.  The Parties may file objections to this Report and Recommendation.  <u>See</u>

Local Civ. Rule 72.1.  Failure to file timely objections may constitute a waiver of any

appellate rights.

BY THE COURT:

/s/ Elizabeth T. Hey

_____

ELIZABETH T. HEY
UNITED STATES MAGISTRATE JUDGE